**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN THE MATTER OF:<br>Swift Air, L.L.C.,<br>Debtor.<br>Swift Aircraft Management LLC,<br>Appellant,<br>vs.<br>MorrisAnderson & Associates Limited,<br>Appellee. | No: CV-20-00854-PHX-JAT<br><br>**ORDER** |

Appellant Swift Aircraft Management LLC ("Appellant") appeals from the Judgment (the "Judgment"), (Doc. 1 at 9–12), and the Under Advisement Order (the "Under Advisement Order"), (Doc. 19-2 at 65–262),[1] entered by the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). In support, Appellant filed an Opening Brief. (Doc. 12). Appellee MorrisAnderson & Associates Limited ("Appellee" or the "Trustee") filed a Brief in response, (Doc. 17), to which

---

[1] This appeal relates to the appeals in *Transjet Incorporated v. MorrisAnderson & Associates Limited*, Case No. CV-20-00849-PHX-JAT and *Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT (the "Redeye Appeal") (together with the present appeal, the "Related Appeals"). The appellants in the Related Appeals have briefed issues that cross all three Related Appeals in the appellants' Opening Brief in the Redeye Appeal as permitted by Fed. R. Bankr. P. 8014(e). Any citation of Docs. 19, 19-1, 19-2, 19-3, 19-4, 19-5, 19-6, 19-7, or 19-8 will refer to the appellants' Opening Brief and attachments in the Redeye Appeal.

Appellant filed a Reply Brief, (Doc. 18). After reviewing the briefs and the record, the Court issues the following order.

## I.   BACKGROUND

The below is a brief summary of the background of this case. A more extensive discussion of the background can be found in the Under Advisement Order, (Doc. 19-2 at 75–116), and the appellants' Opening Brief in the Redeye Appeal, (Doc. 19 at 10–14).

Prior to December 21, 2011, Swift Air, LLC ("Swift" or the "Debtor") operated as an aviation management company under a combined 14 CFR Part 121/135 Certificate ("Part 121 Certificate" and "Part 135 Certificate") issued by the Federal Aviation Administration ("FAA"). (Doc. 19 at 10). Swift's business involved managing aircraft owned by other parties and booking charter contracts. (*Id.*). Swift maintained a Part 135 Certificate business which managed corporate/individual charter flights (the "Part 135 Business"), and Swift also maintained a Part 121 Certificate business which consisted of flying large charter groups, in particular, professional sports teams (the "Part 121 Business"). (*Id.* at 11). Keeping the Part 121 Certificate operational required that certain criteria be satisfied, such as having five specific positions filled by qualified employees (the "Five Wise Men").[2] (Doc. 19-5 at 173–74).

Swift was a wholly owned subsidiary of Swift Aviation Group, Inc. ("SAG"). (Doc. 19-2 at 260). SAG also held all the equity interests in Swift Aviation Sales, Inc. ("Sales"), Swift Aviation Management, LLC ("SAVM"), and Swift Aviation Services, LLC ("Services"). (*Id.*). SAG was wholly owned by the Jerry and Vickie Moyes Family Trust (the "Moyes Trust"). (*Id.*). Jerry Moyes ("Moyes") was the sole trustee of the Moyes Trust. (*Id.*). The Moyes Trust also held all the equity interests in Transjet, Inc. ("Transjet"), Transjet's three subsidiaries (the "Transjet Subsidiaries"), Transpay, Inc. ("Transpay"), and SME Steel Contractors, Inc. ("SME"). (*Id.*). Moyes also personally owned fifty percent of Redeye II, LLC ("Redeye"). (*Id.*). Moyes served as Swift's president, and Kevin Burdette ("Burdette") served as Swift's vice-president. (*Id.* at 78). The companies owned

---

[2] The positions are Chief Pilot, Director of Operations, Chief Inspector, Director of Safety, and Director of Maintenance. (Doc. 19-5 at 174).

by Moyes and the Moyes Trust regularly did business with one another and through this business incurred significant accounts receivable and accounts payable that were outstanding on December 21, 2011. (*Id.* at 77–87).

In 2011, Swift's balance sheet reflected liabilities greater than assets by more than $3 million. (*Id.* at 88). In the latter half of 2011, Burdette met with two potential buyers for Swift who ultimately did not purchase the company. (*Id.*). Then, in October 2011, Jeff Conry ("Conry"), on behalf of Avondale Aviation II, LLC and Jordan Gunthorpe Holdings, LLC (collectively, the "Buyers"), approached Burdette about purchasing Swift's Part 121 Business (the "Transaction"). (Doc. 19 at 11). Notably, the Buyers told Burdette that they only wanted to acquire the equity in Swift's Part 121 Business and that they intended to merge it with their recently acquired business, Direct Air, which needed a Part 121 Certificate. (Doc. 19-2 at 88–89). The Buyers also told Burdette that they planned to obtain a $5 million investment in Swift after its acquisition. (*Id.* at 90).

The Transaction moved forward, terms were solidified, and the Buyers closed on the purchase of the equity interest in Swift for a *de minimis* payment of $100 on December 21, 2011 (the "Transaction Date"). (Doc. 19 at 11–12). Swift's Part 135 Business was not included in the Transaction, so it was transferred into a newly created entity, Swift Aircraft Management, LLC ("SAM"). (*Id.* at 12). As part of the Transaction, Swift transferred certain assets and liabilities, including accounts receivable and accounts payable, associated with the Part 135 Business to SAM and SAG pursuant to the Part 135 Assignment and Assumption Agreement and Guarantee (the "Assignment and Assumption Agreement"). (*Id.* at 13). After the closing of the Transaction, Swift and the other Moyes owned companies executed an Inter-Company Settlement Agreement and Mutual Release (the "Settlement Agreement"). (*Id.*). The Settlement Agreement released Swift from any debts or obligations to the other Moyes owned companies and facilitated a transfer of assets and liabilities between Swift and certain other Moyes owned companies (the "Transfers"). (*Id.*). The Transfers included a receivable from SAVM (the "SAVM Receivable") and a receivable from Redeye (the "Redeye Receivable"). (*Id.*).

After the Transaction, the newly acquired Swift ("New Swift") experienced cashflow shortages. (Doc. 19-2 at 105). The $5 million investment that the Buyers planned to obtain for New Swift never materialized, and New Swift never merged with Direct Air. (*Id.* at 107). New Swift also entered into new post-Transaction contracts that exacerbated its money problems. (*Id.*). These and other problems led New Swift to commence a Chapter 11 bankruptcy proceeding on June 27, 2012. (*Id.*). New Swift emerged from its Chapter 11 bankruptcy proceeding through a confirmed restructuring plan in October 2013 after receiving approximately $6.3 million from Nimbos Holings, LLC ("Nimbos") in exchange for the equity interests in the reorganized New Swift. (Doc. 19 at 14).

On June 27, 2014, Appellee initiated the underlying adversary proceeding. (*Id.*). Appellee's Third Amended Complaint asserted, among other things, preference, fraudulent transfer, and breach of fiduciary duty claims against Appellant and others. (*Id.*). The Bankruptcy Court held a trial after which the Bankruptcy Court issued the Under Advisement Order and the Judgment. (*Id.* at 8, 14). During the adversary proceeding, Appellant's expert, Grant Lyon ("Lyon") testified as did Appellee's expert, Michael Spindler ("Spindler"). (*See id.* at 23–24).

Appellant appealed the Judgment and the Under Advisement Order. (Doc. 1 at 6). Appellant filed an Opening Brief. (Doc. 12). Appellee filed a Brief in response, (Doc. 17), to which Appellant filed a Reply Brief, (Doc. 18).

## II.     LEGAL STANDARD

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a), which provides that "district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1). Matters referred to a bankruptcy court are classified as either "core" or "non-core" proceedings. 28 U.S.C. § 157(b). Core proceedings are those "arising under title 11, or arising in a case under title 11," and non-core proceedings are those that are "otherwise related to a case under title 11." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558 (9th

Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). Bankruptcy court judges may enter final orders on all core proceedings and may submit proposed findings of fact and conclusions of law to the district court for entry of final orders on all non-core proceedings. *See* 28 U.S.C. § 157(b)–(c). Bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." *Id.* § 157(c)(2).

Regarding final orders by a bankruptcy court, this Court reviews a bankruptcy court's decision for "abuse of discretion: 'The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error.'" *In re Taylor*, 599 F.3d 880, 887 (9th Cir. 2010) (quoting *In re Straightline Invs., Inc.*, 525 F.3d 870, 876 (9th Cir. 2008)). "Thus, the first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009). "If the bankruptcy court identified the correct legal rule, we then determine whether its 'application of the correct legal standard [to the facts] was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *In re Taylor*, 599 F.3d at 887 (quoting *Hinkson*, 585 F.3d at 1262). "If the bankruptcy court did not identify the correct legal rule, or its application of the correct legal standard to the facts was illogical, implausible, or without support in inferences that may be drawn from the facts in the record, then the bankruptcy court has abused its discretion." *Id.* at 887–88. Regarding findings of fact, "'a finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Hinkson*, 585 F.3d at 1260 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The parties do not dispute that the Bankruptcy Court had the authority to enter final orders in the instant appeal.

### III. ANALYSIS

Appellant makes four arguments in its opening brief: (1) the Bankruptcy Court erred in determining that Swift was insolvent at the time of the Transfers under 11 U.S.C. §

547(b)(3); (2) the Bankruptcy Court erred by failing to apply a fair market value standard to certain receivables in the Transfers for purposes of liability under 11 U.S.C. § 550; (3) the Bankruptcy Court erred in determining that Appellee satisfied its burden under 11 U.S.C. § 547; and (4) the Bankruptcy Court abused its discretion in taking judicial notice of certain facts. (Doc. 12 at 14–17). These arguments are addressed below.

### A. The Bankruptcy Court's Determination that Swift was Insolvent at the Time of the Transfers Under 11 U.S.C. § 547(b)(3)

The Court conducted a *de novo* review of this issue in the Redeye Appeal and concluded, as the Bankruptcy Court did, that Swift was insolvent at the time of the Transfers. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Section III.D.1 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did not abuse its discretion in determining that Swift was insolvent that the time of the transfers, so the Court affirms the Bankruptcy Court on this issue.

### B. The Bankruptcy Court's Valuation Standard for Certain Receivables in the Transfers for Purposes of Liability Under 11 U.S.C. § 550

The Court conducted a de novo review of this issue in the Redeye Appeal and concluded that the Bankruptcy Court applied the correct valuation standard for the receivables in the Transfers. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Section III.D.2 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did not abuse its discretion in its valuation of the receivables in the Transfers, so the Court affirms the Bankruptcy Court on this issue.

### C. The Bankruptcy Court's Determination that Appellee Satisfied its Burden Under 11 U.S.C. § 547(b)(1) and (b)(2)

The Court conducted a de novo review of this issue in the Redeye Appeal and concluded, as the Bankruptcy Court did, that Appellee satisfied its burden under 11 U.S.C. § 547(b)(1) and (b)(2). *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Section III.D.3 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did not abuse its discretion in determining that Appellee satisfied its

burden under 11 U.S.C. § 547(b)(1) and (b)(2), so the Court affirms the Bankruptcy Court on this issue.

### D. The Bankruptcy Court's Taking of Judicial Notice of Certain Facts

The Court conducted a *de novo* review of this issue in the Redeye Appeal and concluded that the Bankruptcy Court did not improperly take judicial notice of certain facts, and even if it did, any error was harmless. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT, Section III.D.5 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did not abuse its discretion by taking improper judicial notice of certain facts, so the Court affirms the Bankruptcy Court on this issue.

## IV. CONCLUSION

Based on the foregoing,

**IT IS ORDERED AFFIRMING** the Bankruptcy Court's Judgment and Under Advisement Order in their entirety. Pursuant to Federal Rule of Bankruptcy Procedure 8024(a), the Clerk of the Court shall enter judgment accordingly.

Dated this 1st day of December, 2020.

James A. Teilborg
Senior United States District Judge